## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KNIGHTS OF COLUMBUS STAR OF THE
SEA COUNCIL 7297,

        Plaintiff,

   v.

CITY OF REHOBOTH BEACH,
DELAWARE;

STAN MILLS, in his official capacity as
Mayor of Rehoboth Beach, Delaware[1];

PAUL KUHNS, individually;

SHARON LYNN, individually and in her
official capacity as City Manager of Rehoboth
Beach, Delaware;

        Defendants.

Civil Case. No. 1:20-cv-00841-LPS

**JURY TRIAL DEMANDED**

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Christopher DiPompeo  (*pro hac vice*)
Kaytlin L. Roholt (*pro hac vice*)
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001-2113
Telephone:  (202) 879-7686
Fax:  (202) 626-1700
cdipompeo@jonesday.com
kroholtlane@jonesday.com

Roger Byron (*pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 Plano Parkway, Suite 1600
Plano, TX 75075
Telephone: (972) 941-4444
Fax: (972) 941-4457
rbyron@libertyinstitute.org

Michael P. Morton (Bar ID # 002492)
Robert J. Valihura, Jr. (Bar ID # 02638)
David C. Zerbato (Bar ID # 005671)
MORTON, VALIHURA & ZERBATO, LLC
3704 Kennett Pike, Suite 200
Greenville Professional Building
Greenville, DE 19807
Telephone: (302) 426-1313
Fax: (302) 426-1300
mmorton@mvzllc.com

*Counsel for Plaintiff Knights of Columbus
Star of the Sea Council 7297*

Dated:  November 2, 2020

---

[1] Paul Kuhns was the Mayor of Rehoboth Beach, Delaware when this action was commenced on June 23, 2020.  He was thereafter succeeded by Stan Mills.  Mills was accordingly automatically substituted as a defendant in his official capacity pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** ................................................................. 1

**NATURE AND STATE OF THE PROCEEDINGS** ........................... 3

**SUMMARY OF THE ARGUMENT** ............................................. 3

**STATEMENT OF FACTS** ....................................................... 4

    I.    The Community's Holiday Displays ................................... 4

    II.   The 2018 Christmas Season ............................................ 6

    III.  The 2019 Christmas Season ........................................... 7

**ARGUMENT** ....................................................................... 9

    I.    The Knights' Constitutional Claims Are Likely To Succeed On The Merits.................... 9

      A.    The Knights' Free Speech Claim Is Likely To Succeed ................................. 10

          1. The City's No-Religious-Displays Policy Violates The Free Speech Clause Of The First Amendment Because It Impermissibly Discriminates Based On Viewpoint. .. 10

          2. Fear Of An Establishment Clause Violation Does Not Justify Infringement On The Knights' First Amendment Rights .......................................................... 13

      B.    The Knights' Free Exercise Claim Is Likely To Succeed............................... 14

    II.   The Knights Has Suffered And Will Continue To Suffer Irreparable Harm As A Result Of The City's No-Religious-Displays Policy .................... 18

    III.  The Balance of Hardships Weighs In Favor Of A Preliminary Injunction...................... 19

    IV.  The Public Interest Favors A Preliminary Injunction ...................................... 20

**CONCLUSION** .................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU v. Schundler*,
    168 F.3d 92 (3d Cir. 1999) (Alito, J.) ........................................................................13

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
    140 S. Ct. 1198 (2020) .......................................................................................1, 13

*Bd. of Educ. v. Mergens*,
    496 U.S. 226 (1990) ........................................................................................14

*Bullock v. Carney*,
    806 F. App'x 157 (3d Cir. 2020) (Phipps, J., dissenting) ........................................16

*Capitol Square Review & Advisory Bd. v. Pinette*,
    515 U.S. 753 (1995) ........................................................................................14

*Carey v. Brown*,
    447 U.S. 455 (1980) ........................................................................................10

*Chicago Newspaper Publishers Assn. v. City of Wheaton*,
    697 F. Supp. 1464 (N.D. Ill. 1988) ....................................................................18

*Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*,
    386 F.3d 514 (3d Cir. 2004) ................................................................3, 11, 12, 14

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) .............................................................................. passim

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ....................................................................................20, 21

*Combs v. Homer-Ctr. Sch. Dist.*,
    540 F.3d 231 (3d Cir. 2008) .............................................................................16

*Congregation Lubavitch v. City of Cincinnati*,
    923 F.2d 458 (6th Cir. 1991) ...........................................................................19

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ........................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

*Employment Div., Dep't of Human Res. of Or. v. Smith*,
  494 U.S. 872 (1990)..................................................................................................16

*Good News Club v. Milford Central School*,
  533 U. S. 98 (2001)..................................................................................................11

*Greater Philadelphia Chamber of Commerce v. City of Philadelphia*,
  949 F.3d 116 (3d Cir. 2020)....................................................................................18

*Lamb's Chapel v. Center Moriches Union Free School Dist.*,
  508 U.S. 384 (1993)............................................................................................11, 14

*Lofton v. D.C.*,
  7 F. Supp. 3d 117 (D.D.C. 2013) ............................................................................19

*Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*,
  938 F.3d 424 (3d Cir. 2019)........................................................................... passim

*Novartis Pharm. Corp. v. Accord Healthcare Inc.*,
  2019 WL 2588450, (D. Del. June 24, 2019)………………………………………3

*Perry v. Los Angeles Police Dept.*,
  121 F.3d 1365 (9th Cir. 1997), *cert. denied*, 523 U.S. 1047 (1998)......................10

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty.*,
  653 F.3d 290 (3d Cir. 2011)........................................................................10, 11, 13

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
  515 U.S. 819 (1995)....................................................................................10, 11, 14

*Sanders Cnty. Republican Cent. Comm. v. Bullock*,
  698 F.3d 741 (9th Cir. 2012) ..................................................................................18

*Schneider v. State of New Jersey, Town of Irvington*,
  308 U.S. 147 (1939)..................................................................................................17

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)..................................................................................................17

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002)........................................................................... passim

# TABLE OF AUTHORITIES

**Page(s)**

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
　137 S. Ct. 2012 (2017) ............................................................................................17

*Widmar v. Vincent*,
　454 U.S. 263, 270–75 (1981)……………………………………………………..14

**OTHER AUTHORITIES**

U.S. Const. amend. I ............................................................................................ passim

U.S. Const. amend. XIV ................................................................................................3

LIBRERIA EDITRICE VATICANA (Dec. 1, 2019), *available at*
　http://www.vatican.va/content/francesco/en/apost_letters/documents/papa-
　francesco-lettera-ap_20191201_admirabile-signum.html .........................................6

## INTRODUCTION

Each year during the Christmas holiday season, the City of Rehoboth Beach, Delaware ("the City") permits private groups to erect and maintain holiday displays at the City's Bandstand/Boardwalk Circle—a central public area.  But relying on a policy banning all private displays with a religious viewpoint from public property, Defendants denied the Knights of Columbus's ("the Knights") request to display a crèche—or nativity scene—on City property during the 2018 and 2019 Christmas holiday seasons.  Both on its face and as applied to the Knights, the City's no-religious-displays policy contravenes the Free Speech and Free Exercise Clauses of the First Amendment.

By its blanket ban on displays with a religious viewpoint, and by allowing secular Christmas displays while prohibiting religious displays, the City has engaged in impermissible viewpoint discrimination in violation of the First Amendment.  The City has excluded the Knights' display merely because it presents a religious viewpoint on the Christmas season.  Indeed, "once the government declares Christmas open for commentary, it can hardly turn around and mute religious speech on a subject that so naturally invites it."  *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 140 S. Ct. 1198, 1199–1200 (2020) (statement of Gorsuch, J. respecting the denial of certiorari).  But that is precisely what Defendants did here.

The City's no-religious-displays policy also violates the Free Exercise Clause.  As the Supreme Court has made clear, "a law targeting religious beliefs as such is never permissible." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  By explicitly targeting religious displays for exclusion from the community's holiday traditions, the City's no-religious-displays policy violates this basic free exercise guarantee.

1

The City's censorship of and discrimination against religion is clear and overt.  In a November 2019 interview regarding the City's decision to prohibit the Knights from displaying the crèche on City property, Mayor Paul Kuhns ("Defendant Kuhns") stated: "the city policy is not to have religious displays on public property."  Deana Harley, *Rehoboth Beach says no nativity scene allowed on boardwalk*, WMDT (Nov. 18, 2019) (video at 00:55), https://www.wmdt.com/2019/11/rehoboth-beach-says-no-nativity-scene-allowed-on-boardwalk/. And it is equally clear that Defendants prohibited the Knights from displaying the crèche at the Bandstand/Boardwalk Circle *because* the crèche is religious.  In a December 5, 2019 email exchange, the Knights asked City Manager Sharon Lynn ("Defendant Lynn") why it could not place the crèche at the Bandstand/Boardwalk Circle:  "The Knights can't put the creche [sic] on the Boardwalk or other public property because it's religious.  Is that right?"  Ex. 1, Decl. of Rev. William Cocco ("Cocco Decl.") ¶¶ 21, 28 & Ex. F.  Defendant Lynn replied:  "Yes correct."  *Id.* Defendants' candor makes this an easy case.

Because yet another Christmas season is fast approaching, the Knights seeks a preliminary injunction to prevent the City from applying its unlawful no-religious-displays policy to prohibit display of the crèche.  The Knights easily satisfies the four-part test for preliminary relief.  First, the City's impermissible discrimination against the Knights' religious viewpoint and practice plainly violates the Free Speech and Free Exercise Clauses of the First Amendment.  The Knights are therefore likely to succeed on the merits of their constitutional claims.  Second, the City's policy threatens to cause the Knights irreparable injury.  Indeed, the City has already rejected the Knights' request to display the crèche at the Bandstand/Boardwalk Circle two years in a row.  In the absence of this Court's intervention, the City's policy will again prevent the Knights from communicating its religious message during the 2020 Christmas season.  Third, the City will suffer

no countervailing harm as a result of a preliminary injunction.  And fourth, the public interest plainly favors the protection of constitutional rights.  Preliminary injunctive relief is therefore necessary to secure the Knights' free speech and free exercise rights and promote the public interest while this litigation proceeds.

## NATURE AND STATE OF THE PROCEEDINGS

The Knights filed this action on June 23, 2020, asserting that the City's no-religious-displays policy, both facially and as applied, violates the Free Speech and Free Exercise Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.  After a series of extensions, Defendants filed their answer on August 28, 2020.  The Knights seeks a preliminary injunction enjoining Defendants from enforcing the City's no-religious-displays policy pending this Court's final judgment.

## SUMMARY OF THE ARGUMENT

1.      A preliminary injunction is warranted because the Knights satisfies all four factors for obtaining temporary injunctive relief:  "A reasonable likelihood of success on the merits, irreparable harm if the injunction is not granted, a balance of hardship tipping in its favor, and the injunction's favorable impact on the public interest." *Novartis Pharm. Corp. v. Accord Healthcare Inc.*, No. 18-cv-1043-LPS, 2019 WL 2588450, at *1 (D. Del. June 24, 2019) (Stark, J.).

2.      *First*, the Knights is likely to succeed on the merits of its First Amendment claims. The City's no-religious-displays policy constitutes impermissible viewpoint discrimination in violation of the First Amendment's Free Speech Clause because it prohibits the Knights' speech in the form of its crèche display solely because of the display's religious viewpoint.  That the City permits in the same location a private secular holiday display from another group makes its unlawful discrimination even clearer. *See Child Evangelism Fellowship of N.J. Inc. v. Stafford*

3

*Twp. Sch. Dist.*, 386 F.3d 514, 528 (3d Cir. 2004) ("[I]f government permits the discussion of a topic from a secular perspective, it may not shut out speech that discusses the same topic from a religious perspective.").  The policy also violates the Knights' free exercise rights because it "single[s] out" the Knights' "religiously motivated conduct for discriminatory treatment." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 168 (3d Cir. 2002).

3.      *Second*, the Knights has suffered and will continue to suffer irreparable harm as a result of the City's no-religious-displays policy because its First Amendment rights are being abridged.  *See Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quotation marks omitted)).

4.      *Third*, the balance of hardships tips in favor of an injunction.  In the absence of injunctive relief, the Knights' First Amendment rights will continue to be impaired, but enjoining Defendants from prohibiting the crèche pursuant to the City's no-religious-displays policy "would cause neither the [City] nor its residents any serious injury." *Tenafly*, 309 F.3d at 178.

5.      *Fourth*, the public interest favors the protection of the Knights' First Amendment rights because "there are no societal benefits justifying a burden on religious freedom." *Id.* at 178 (quotation marks omitted).

## STATEMENT OF FACTS

### I.      The Community's Holiday Displays

The Rehoboth Beach community has a long history of celebrating the Christmas season with both secular and religious holiday displays by private groups at the Bandstand/Boardwalk Circle—the eastern terminus of Rehoboth Avenue that encircles the City's bandstand and includes the adjacent portion of the Boardwalk.  *See* Cocco Decl. ¶ 4.  The Bandstand sits on the median, which is adjacent to the Boardwalk, all of which are City property.  *See id.* ¶¶ 4, 7; Defs.' Answer

[D.I. 13] ¶¶6, 32, 40–41, 45.  This venue is a popular commercial site where the Rehoboth Beach community comes together.  Over time, the Bandstand/Boardwalk Circle has become the primary location of the community's holiday traditions.  During the Christmas season, residents of the Rehoboth Beach community visit the Bandstand/Boardwalk Circle to view the holiday displays and participate in the community's celebration of the Christmas holiday.  *See* Cocco Decl. ¶ 4; Defs.' Answer ¶ 30.  These annual holiday displays include a Christmas tree, holiday lights and light displays, and a large Santa's House, and until recent years included a crèche.  *See* Cocco Decl. ¶ 5; Defs.' Answer ¶ 35.

The Santa's House features prominently in the community's holiday displays. It is displayed each year at the Bandstand/Boardwalk Circle on the portion of the Boardwalk adjacent to the bandstand.  The Santa's House is large enough to hold two adults—including one adult dressed as Santa Claus—and at least one child at a time.  The Santa's House is erected, sponsored, displayed, and owned by the Rehoboth Beach-Dewey Beach Chamber of Commerce ("the Chamber"), a private organization.  *See* Cocco Decl. ¶¶ 6, 23 & Ex. A; Defs.' Answer ¶¶ 32–33.

Beginning in the 1930s, a crèche was displayed at the Bandstand/Boardwalk Circle during the Christmas season as part of the community's annual holiday tradition.  The Knights is not aware of a single complaint about the crèche across its eight-decade history.  *See* Cocco Decl. ¶ 7. For many years, the Kiwanis Club of Coastal Delaware, a local public service organization, owned the crèche and displayed it at the Bandstand/Boardwalk Circle each year.  *See id.*  The crèche's traditional location during the Christmas season is on the median at the Bandstand/Boardwalk Circle, directly across from the Boardwalk where the Santa's House is displayed.  But in recent years, the City erected a new public restroom and carried out renovations at the

Bandstand/Boardwalk Circle.  During the construction, the crèche was temporarily displayed at an alternate location on Rehoboth Avenue.  *See id.* ¶¶ 8, 24 & Ex. B; Defs.' Answer ¶ 40.

## II.     The 2018 Christmas Season

In 2018, the Knights took on the role of erecting the crèche during the Christmas season. The Knights sincerely believes that Christmas is an important religious holiday and that it should display the crèche among the other displays at the Bandstand/Boardwalk Circle in order to express the religious meaning of the holiday.  *See* Cocco Decl. ¶¶ 9–10.[2]  On December 2, 2018, Reverend William Cocco, the Knights' chaplain and Pastor of Saint Edmond Church, asked Defendants Kuhns and Lynn for permission to display the crèche on the grassy area of the median at the Bandstand/Boardwalk Circle during the 2018 Christmas season.  *See id.* ¶ 29 & Ex. G.  Believing it had permission, the Knights erected the crèche on the grassy area of the median at the Bandstand/Boardwalk Circle on December 4, 2018.  *See id.* ¶¶ 11–13.  The next day, Defendant Lynn ordered that the crèche be removed.  Although surprised by the City's sudden demand, the Knights removed the crèche on December 6, 2018.  *See id.* ¶¶ 14–15; Defs.' Answer ¶ 45.

Throughout the remainder of the 2018 Christmas season, Defendant Kuhns made several public statements targeting the crèche because of its religious nature.  For example, at the December 7, 2018 meeting of the City Board of Commissioners, Defendant Kuhns read aloud a letter the City reportedly received from the Anti-Defamation League.  The letter discouraged the City from allowing any religious displays during the holiday season.  The only religious display specifically referenced by Defendant Kuhns in his reading of the letter, however, was a crèche. *See* The Commissioners of Rehoboth Beach Special Workshop Meeting, (video at 6:00–8:30)

---

[2] *See also* Apostolic Letter, The Holy See, LIBRERIA EDITRICE VATICANA (Dec. 1, 2019), *available at* http://www.vatican.va/content/francesco/en/apost_letters/documents/papa-francesco-lettera-ap_20191201_admirabile-signum.html ("I wish to encourage the beautiful family tradition of preparing the nativity scene in the days before Christmas, but also the custom of setting it up in the workplace, in schools, hospitals, prisons and town squares.").

(Dec. 7, 2018), https://cityofrehoboth.civicweb.net/document/32126?splitscreen=true&media=. And at the December 10, 2018 meeting of the City Board of Commissioners, Mayor Kuhns again addressed the removal of the crèche, stating that "singular displays of this sort are more appropriately placed on private property." *See* The Commissioners of Rehoboth Beach Workshop Meeting, (video at 9:55–12:55) (Dec. 10, 2018), https://cityofrehoboth.civicweb.net/document/32218?splitscreen=true&media=true. Despite Defendants' prohibition of the crèche and other religious displays, they permitted the Chamber— a private organization—to display a secular Santa's House at the Bandstand/Boardwalk Circle during the 2018 Christmas season. *See* Cocco Decl. ¶ 16 & Exs. A & B.

### III.    The 2019 Christmas Season

Unfortunately, Defendants continued to enforce the City's no-religious-displays policy during the 2019 Christmas season.  On October 22, 2019, the City, via Defendant Lynn, sent Rev. Cocco a letter explaining that the Chamber had offered its property at 306 Rehoboth Avenue "as a suitable location for the creche [sic] display." *Id.* ¶¶ 19, 25 & Ex. C; Defs.' Answer ¶¶ 58–59, 71. The Chamber's property, however, is located *over one half mile* from the Bandstand/Boardwalk Circle and is wholly removed from the community's traditional holiday displays—including the Santa's House—which are located predominately at the Bandstand/Boardwalk Circle.  *See* Cocco Decl. ¶¶ 19, 26 & Ex. D (depicting the approximate locations of the Bandstand/Boardwalk Circle, the Santa's House, and the Chamber's property); Defs.' Answer ¶ 59.  The City's proposed solution—allowing secular displays on City property but relegating the crèche to an isolated tract of privately controlled land—would effectively exclude the Knights from participating in the community's holiday traditions and sharing at the Bandstand/Boardwalk Circle its message about the religious meaning of Christmas.

Seeking once more to participate in the community's holiday traditions on equal terms, in late November and early December of 2019, the Knights emailed Defendant Lynn to ask whether, during the upcoming holiday season, the crèche could be placed on the grassy area of the median at the Bandstand/Boardwalk Circle, where the Knights had placed it in 2018.  Without providing any explanation, Defendant Lynn responded that the location was not available.  *See* Cocco Decl. ¶¶ 20, 27 & Ex. E.  On December 3, 2019, the Knights again emailed Defendant Lynn, this time asking whether the crèche could be placed on the Boardwalk portion of the Bandstand/Boardwalk Circle, as the Chamber of Commerce was permitted to do with the Santa's House.  The Knights noted that there would be "plenty of room" to place the crèche near the Santa's House, which was already displayed on the Boardwalk.  *Id.* ¶¶ 21, 28 & Ex. F; *see also id.* Ex. A (depicting the open space alongside the Santa's House on the Boardwalk).  The following day, Defendant Lynn emailed the Knights, stating:  "The Boardwalk is public property.  Unfortunately the crèche can not [sic] be placed there."  *Id.* ¶¶ 21, 28 & Ex. F.  Seeking to clarify the City's policy, the Knights emailed Defendant Lynn on December 5, 2019 and asked:  "The Knights can't put the creche [sic] on the Boardwalk or other public property because it's religious.  Is that right?"  Defendant Lynn replied:  "Yes correct."  *Id.*  As this email exchange shows, Defendants prohibited the Knights from displaying the crèche at the Bandstand/Boardwalk Circle during the 2019 Christmas season *because* it is religious.

In the weeks leading up to Christmas, the City continued to affirm its no-religious-displays policy.  For example, in a television interview discussing the crèche, Mayor Kuhns confirmed that "the city policy is not to have religious displays on public property."  Deana Harley, Rehoboth Beach says no nativity scene allowed on boardwalk, WMDT (Nov. 18, 2019) (video at 00:55), https://www.wmdt.com/2019/11/rehoboth-beach-says-no-nativity-scene-allowed-on-boardwalk/.

Left with no other option, on December 12, 2019, the Knights sent Defendants Kuhns and Lynn a demand letter, which set forth its position that the City's no-religious-displays policy violates the First Amendment.  *See* Ex. 2, Decl. of Roger Byron ("Byron Decl.") ¶ 7 & Ex. A.  The City Solicitor, Glenn Mandalas, responded to the letter on December 13, 2019, explaining that the City would not change its policy prohibiting religious displays on City property.  *See id.* ¶ 8 & Ex. B.  Pursuant to that  policy—for the second straight year—the City denied the Knights the opportunity to display the crèche at the Bandstand/Boardwalk Circle.  *See* Cocco Decl. ¶ 22.  The privately displayed Santa's House, however, was again permitted at the Bandstand/Boardwalk Circle, along with other secular holiday displays.  *See id.* ¶ 22 & Exs. A & B.

## ARGUMENT

The City's no-religious-displays policy violates the First Amendment's speech and religion guarantees both on their face and as applied to the Knights, and injunctive relief is critical to protect the Knights' constitutional rights while this matter is litigated.

## I.     The Knights' Constitutional Claims Are Likely To Succeed On The Merits.

The City's no-religious-displays policy is antithetical to the First Amendment in two respects.  First, the City's policy unconstitutionally discriminates against the Knights' free speech rights by prohibiting from public property displays with religious viewpoints, including the Knights' crèche, and by prohibiting the Knights' display of the crèche at the Bandstand/Boardwalk Circle because of its religious viewpoint while permitting private secular holiday displays.  This is textbook viewpoint discrimination, "an egregious form of content discrimination" that "violates the First Amendment's most basic promise." *Freethought Soc'y*, 938 F.3d at 432 (quotation marks omitted).  Second, the City's policy violates the Free Exercise Clause of the First Amendment because it unlawfully burdens, targets and singles out the Knights' religious practice for

discriminatory treatment.  As the Supreme Court has made clear, "[a] law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546.  For the reasons explained below, this is not one of those rare cases.  Because the Knights is likely to succeed on one or both of these claims, it is likely to succeed on the merits.

**A.    The Knights' Free Speech Claim Is Likely To Succeed**

**1.    The City's No-Religious-Displays Policy Violates The Free Speech Clause Of The First Amendment Because It Impermissibly Discriminates Based On Viewpoint.**

The City's no-religious-displays policy embodies the kind of viewpoint discrimination that the First Amendment forbids.  Such "blanket bans on religious messages . . . constitute impermissible viewpoint discrimination." *Freethought Soc'y*, 938 F.3d at 432 (quotation marks omitted).  Both the Supreme Court and the Third Circuit have made clear that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); *Freethought Soc'y*, 938 F.3d at 432 (quoting same). The government impermissibly discriminates on the basis of viewpoint where it excludes a speaker from expressing "[a] point of view he espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985); *Freethought Soc'y*, 938 F.3d at 436 (quoting same).  Thus, "no matter what kind of property is at issue," *Freethought Soc'y*, 938 F.3d at 432, and "[r]egardless of whether [it] is a public or nonpublic forum,"[3] *Pittsburgh League*

---

[3] The Bandstand/Boardwalk Circle is a quintessential public forum akin to a public street or sidewalk.  *See, e.g.*, *Perry v. Los Angeles Police Dept.*, 121 F.3d 1365, 1367–69 (9th Cir. 1997) (holding that the Venice Beach Boardwalk is a traditional public forum), *cert. denied*, 523 U.S. 1047 (1998).  Such public fora are "so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Carey v. Brown*, 447 U.S. 455, 460 (1980).  But the court "need not tackle the forum-selection question" because "no matter what kind of property is at issue, viewpoint discrimination is out of bounds." *Freethought Soc'y*, 938 F.3d at 436, 432 (quotation marks omitted).  "[I]n any forum, '[t]he

*of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 296 (3d Cir. 2011), "viewpoint discrimination is out of bounds" and the government may not restrict private speech based on the speaker's point of view. *Freethought Soc'y*, 938 F.3d at 432.

This is particularly true where the viewpoint at issue is religious. The Supreme Court has "adopted a broad construction" of viewpoint discrimination, "providing greater protection to private religious speech on public property." *Freethought Soc'y*, 938 F.3d at 433 (alterations and quotation marks omitted). Thus, "if government permits the discussion of a topic from a secular perspective, it may not shut out speech that discusses the same topic from a religious perspective." *Child Evangelism Fellowship*, 386 F.3d at 528.

Relying on this principle of viewpoint neutrality, the Supreme Court has rejected anti-religion policies materially identical to the City's policy no fewer than three times. *See Good News Club v. Milford Central School*, 533 U. S. 98, 108–10 (2001) (where public school opened its property to groups that "promote[] the moral and character development of children," holding that school could not exclude a group that sought "to teach moral lessons from a Christian perspective through live storytelling and prayer"); *Rosenberger*, 515 U.S. at 831 (1995) (invalidating a university policy that withheld funding from "student journalistic efforts with religious editorial viewpoints"); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 393 (1993) (holding that school district engaged in unconstitutional viewpoint discrimination when it "permit[ted] school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint"). The Third Circuit has also repeatedly invalidated blanket bans on religious messages

---

government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Id.* at 432 (quoting *Rosenberger*, 515 U.S. at 829); *see also Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty.*, 653 F.3d 290, 296 (3d Cir. 2011) ("Viewpoint discrimination is anathema to free expression and is impermissible in both public and nonpublic fora.").

like the one imposed by the City.  *See, e.g.*, *Freethought Soc'y*, 938 F.3d at 435 (invalidating county transit system's advertisement policy that prohibited religious messages); *Child Evangelism Fellowship*, 386 F.3d at 529 (where public school permitted community groups to use its facilities and distribute materials to students, holding that school engaged in unconstitutional viewpoint discrimination when it denied a religious group permission to distribute flyers and Bibles).  In all of these cases, the government permitted expressive activity regarding certain subjects but excluded speakers wishing to express a religious viewpoint on those subjects.  What the City did here is no different.

The City's no-religious-displays policy targets religious viewpoints for disfavor both on its face and as applied.  Facially, the City's discrimination against religious viewpoints is evident from Defendants' own statements of the City's policy.  As Defendant Kuhns affirmed, "the city policy is not to have religious displays on public property."  Deana Harley, Rehoboth Beach says no nativity scene allowed on boardwalk, WMDT (Nov. 18, 2019) (video at 00:55), https://www.wmdt.com/2019/11/rehoboth-beach-says-no-nativity-scene-allowed-on-boardwalk/.  This kind of "blanket ban[] on religious messages" plainly "constitute[s] impermissible viewpoint discrimination."  *Freethought Soc'y*, 938 F.3d at 432.

The City's application of its no-religious-displays policy to the Knights is equally discriminatory.  By prohibiting the Knights from displaying its crèche on City property because it is religious, and by allowing the Chamber—a private organization—to display a Santa's House at the Bandstand/Boardwalk Circle during the 2018 and 2019 Christmas holiday seasons, while prohibiting the Knights from displaying a crèche at the Bandstand/Boardwalk Circle during those same seasons because of the religious viewpoint communicated by the crèche, the City engaged in unlawful religious viewpoint discrimination against the Knights.  As Defendant Lynn confirmed

12

in her December 5, 2019, email to the Knights, the Knights were prohibited from displaying the crèche "on the Boardwalk or other public property because it's religious."  Cocco Decl., Ex. F. Defendant Lynn's confirmation makes clear that the City rejected the Knights' request to display the crèche *because* the crèche conveys a religious viewpoint on Christmas.  But "once the government declares Christmas open for commentary, it can hardly turn around and mute religious speech on a subject that so naturally invites it."  *Archdiocese of Washington*, 140 S. Ct. at 1199–1200 (2020) (statement of Gorsuch, J. respecting the denial of certiorari).  Thus, as applied, the City's no-religious-displays policy impermissibly "distinguish[es] between those who seek to express secular and religious views on the same subjects."  *Freethought Soc'y*, 938 F.3d at 434.

The City's no-religious-displays policy and its prohibition of the Knights' crèche display fall squarely within the class of unlawful viewpoint discrimination that the Supreme Court and the Third Circuit have consistently proscribed.  This entitles the Knights to relief.  *Port Auth.*, 653 F.3d at 296 (finding plaintiff "entitled to relief because it ha[d] established viewpoint discrimination").  The Knights is therefore likely to succeed on the merits of its argument that the City's no-religious-displays policy, both facially and as applied, violates the First Amendment.

## 2. Fear Of An Establishment Clause Violation Does Not Justify Infringement On The Knights' First Amendment Rights

The City's no-religious-displays policy—and its decision to prohibit the crèche pursuant to that policy—cannot be justified by Establishment Clause concerns.  Indeed, under *ACLU v. Schundler*, 168 F.3d 92 (3d Cir. 1999) (Alito, J.), the City itself could display at the Bandstand/Boardwalk Circle—or even in front of City Hall—its own crèche and/or other religious holiday decorations as part of a larger holiday display that includes secular items and be well within Establishment Clause requirements.  While the crèche in *Schundler* was owned and displayed by the government, *id.* at 95, the Knights' crèche is a *private* display that expresses the

13

religious viewpoint of a private organization.  The Knights' crèche is therefore even further afield from Establishment Clause concerns than a similar display by the City.

"The proposition that [governments] do not endorse everything they fail to censor is not complicated."  *Child Evangelism Fellowship*, 386 F.3d at 534 (quotation marks omitted).  This is because "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect."  *Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality).  As the Third Circuit observed when it found no Establishment Clause violation in providing equal access to a public venue for the religious expression of a religious organization, the Supreme Court "has repeatedly 'rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design.'"  *Child Evangelism Fellowship*, 386 F.3d at 530 (quoting *Rosenberger*, 515 U.S. at 839); *see, e.g.*, *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 763 (1995) (rejecting state's Establishment Clause defense where "[t]he State did not sponsor [the] expression, the expression was made on government property that had been opened to the public for speech, and permission was requested through the same application process and on the same terms required of other private groups").  Indeed, the Supreme Court never has found that fear of an Establishment Clause violation justifies viewpoint discrimination against private expression.  Instead, it has consistently rejected such viewpoint discrimination as unnecessary and unlawful.  *See, e..g.*, *Rosenberger*, 515 U.S. at 842–46; *Lamb's Chapel*, 508 U.S. at 394–97; *Widmar*, 454 U.S. at 270–75.

### B.    The Knights' Free Exercise Claim Is Likely To Succeed

The City's no-religious-displays policy is constitutionally infirm for the independent reason that it violates the First Amendment's Free Exercise Clause.  The Knights believes

Christmas is a religious holiday, and that it should display the crèche at the Bandstand/Boardwalk Circle to express the holiday's religious meaning.  *See* Cocco Decl. ¶ 10.  Any "law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546; *see also Tenafly*, 309 F.3d at 165 (finding "strict scrutiny applies").  Such a "burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest." *Tenafly Eruv Ass'n*, 309 F.3d at 165.  Both facially and as applied, the City's policy is neither neutral nor generally applicable.

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation," *Lukumi*, 508 U.S. at 533, "i.e., if it discriminates against religiously motivated conduct," *Tenafly Eruv Ass'n*, 309 F.3d at 165, "the law is not neutral . . . ," *Lukumi*, 508 U.S. at 533 (citation omitted).  On its face, the City's no-religious-displays policy is not neutral because it explicitly targets religious displays for exclusion from the community's holiday traditions.  *See, e.g.*, Deana Harley, Rehoboth Beach says no nativity scene allowed on boardwalk, WMDT (Nov. 18, 2019) (video at 00:55), https://www.wmdt.com/2019/11/rehoboth-beach-says-no-nativity-scene-allowed-on-boardwalk/ (Defendant Kuhns affirming "the city policy is not to have religious displays on public property.").  Indeed, preventing religious exercise on public property is the very purpose of the City's no-religious-displays policy.

As applied, the City's policy fares no better.  Defendants allow other private groups, like the Chamber, to erect and maintain secular holiday displays at the Bandstand/Boardwalk Circle, but they prohibited the Knights from displaying the crèche *because* the Knights sought to do so for a religious purpose.  As Defendant Lynn confirmed, the City prohibited the Knights from displaying the crèche on the Boardwalk or other public property "because it's religious."  Cocco Decl., Ex. F.  This is precisely the sort of unlawful government action that the Free Exercise Clause

forbids.  *See Tenafly*, 309 F.3d at 168 (finding the government's "selective, discretionary application of Ordinance 691 against the *lechis* violates the neutrality principle of *Lukumi* . . . because it 'devalues' Orthodox Jewish reasons for posting items on utility poles by 'judging them to be of lesser import than nonreligious reasons,' and thus 'single[s] out' the plaintiffs' religiously motivated conduct for discriminatory treatment.").

The City's no-religious-displays policy is also not generally applicable.  A law is not generally applicable if it, "in a selective manner[,] impose[s] burdens only on conduct motivated by religious belief."  *Lukumi*, 508 U.S. at 543.  On its face, the City's policy "single[s] out" "religiously motivated conduct for discriminatory treatment."  *Tenafly*, 309 F.3d at 168.  The City's application of its policy underscores this discrimination.  While the City permitted the Chamber to erect a secular Santa's House at the Bandstand/Boardwalk Circle, it applied its no-religious-displays policy to exclude the Knights from displaying a crèche *because* the crèche is religious.  The City's application of its policy therefore exclusively burdens[4] religious conduct.

Because the City's policy—and Defendants' decision to prohibit the Knights from displaying the crèche pursuant to that policy—is not neutral or generally applicable, it is subject to "the most rigorous of scrutiny,"[5] *Lukumi*, 508 U.S. at 546, and "can be justified only by a state

---

[4] While the Knights' religious exercise has been substantially burdened, "[u]nder *Smith* and *Lukumi* . . . there is no substantial burden requirement when government discriminates against religious conduct."  *Tenafly*, 309 F.3d at 170.

[5] Even if the City's no-religious-displays policy—and its decision to prohibit the Knights from displaying the crèche pursuant to that policy—were neutral and generally applicable, it would still be subject to strict scrutiny because it is a "hybrid" restriction that implicates both free speech *and* free exercise.  *See Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881–82 (1990) (suggesting that "the First Amendment bars application of a neutral, generally applicable law to religiously motivated action" in "hybrid situation[s]" involving "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press"); *see also Bullock v. Carney*, 806 F. App'x 157, 158 (3d Cir. 2020) (Phipps, J., dissenting) ("[F]or a hybrid situation, when a law burdening religion also impinges on another right, such as any communicative activity or parental right, then the restriction receives strict scrutiny." (quotation marks omitted)); *Tenafly*, 309 F.3d at 165 n.26 ("Strict scrutiny may also apply when a neutral, generally applicable law incidentally burdens rights protected by 'the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press[.]'" (quoting *Smith*, 494 U.S. at 881)); *but see Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 247 (3d Cir. 2008) ("Until the Supreme Court provides direction, we believe the hybrid-rights theory to be dicta.").

interest of the highest order," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quotation marks omitted).  The City can show no such interest.  The City's only alleged justification for its no-religious-displays policy was avoiding an Establishment Clause violation.  *See* Byron Decl., Ex. B at 4.  But "a government interest in imposing greater separation of church and state than the federal Establishment Clause mandates is not compelling in the First Amendment context."  *Tenafly*, 309 F.3d at 172.  And as discussed above, *see supra* pp. 13–14, there is no legal basis to conclude that a policy treating secular and religious displays alike would violate the Establishment Clause.  *See also Tenafly*, 309 F.3d at 177–78 ("Because the Free Exercise Clause requires neutral treatment of religion, only in a most unusual case could compliance with free exercise norms offend the Establishment Clause." (citations omitted)).  The City therefore lacks *any* interest—let alone a compelling one—that could justify its discriminatory policy.

Even if the City could establish that its no-religious-displays policy advances "interests of the highest order," the policy would still violate the Free Exercise Clause because the City failed to narrowly tailor it.  *Lukumi*, 508 U.S. at 546.  The City's proposed solution was to relegate the crèche to an isolated tract of privately controlled land, located over a half mile from the community's holiday displays at the Bandstand/Boardwalk Circle.  *See* Byron Decl., Ex. B at 2; Cocco Decl. ¶ 19.  But it is no answer to the City's First Amendment violation to say that the Knights may engage in free exercise of its religion elsewhere.  "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."  *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 163 (1939); *cf. Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) ("Even if a privately owned forum had been available, that fact alone would not justify an otherwise impermissible prior restraint.");

17

*Chicago Newspaper Publishers Assn. v. City of Wheaton*, 697 F. Supp. 1464 (N.D. Ill. 1988) ("The First Amendment does not allow a municipality to restrict speech on the grounds that private actors are willing to sponsor it."). The fact that a private entity has offered to permit the Knights to display the crèche on its property does nothing to cure this constitutional infirmity.

As the City's policy is not neutral and generally applicable or narrowly tailored to advance a compelling government interest, the Knights is likely to prevail on its free exercise claim.

## II.     The Knights Has Suffered And Will Continue To Suffer Irreparable Harm As A Result Of The City's No-Religious-Displays Policy

The City's no-religious-displays policy, and its decision to prohibit the Knights from displaying the crèche, will cause the Knights imminent, irreparable harm. It is well settled that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Freethought Soc'y*, 938 F.3d at 442 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020) ("[I]rreparable harm . . . is generally presumed where the moving party's freedom of speech right is being infringed."); *Tenafly*, 309 F.3d at 178 ("Limitations on the free exercise of religion inflict irreparable injury."). The Knights has demonstrated that the City's no-religious-displays policy discriminates against its viewpoint and prohibits its free exercise of religion. This showing "easily satisfies the irreparable injury requirement." *Tenafly*, 309 F.3d at 178.

The time-sensitive nature of the Knights' speech and religious exercise magnifies the irreparable harm the Knights face in the absence of preliminary relief. Because the Christmas holiday is seasonal, "[a] delay of even a day or two" in obtaining relief would be "intolerable." *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (citation omitted). Indeed, the Knights' request to display the crèche at the Bandstand/Boardwalk Circle

"has already been rejected [twice] under the [City's] policy, which remains in effect." *Freethought Soc'y*, 938 F.3d at 442.  As a result, during the 2018 and 2019 Christmas seasons, the Knights was not able to spread its message at the Bandstand/Boardwalk Circle that Christmas celebrates the birth of Christ, and its free speech and free exercise rights were irretrievably lost.  Given that this litigation is still in the early stages, the 2020 Christmas season is likely to come and go before this Court issues a ruling on the merits.  As with the 2018 and 2019 Christmas seasons, denial of injunctive relief this Christmas season will cause the Knights to suffer complete and irreparable harm "when the holiday season is over, long before final review on the merits can occur before [the] court." *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991) (denying City's motion to stay preliminary injunction that permitted Jewish congregation to display a lit menorah in the public square during Chanukah).  A preliminary injunction is therefore warranted because "no remedy at law can cure [the Knights'] First Amendment injury or give it the prospective relief it seeks." *Freethought Soc'y*, 938 F.3d at 442.

### III.    The Balance of Hardships Weighs In Favor Of A Preliminary Injunction

A preliminary injunction would not harm Defendants, let alone harm them more than denying relief would harm the Knights.  The only potential injury Defendants have identified is their interest in avoiding an Establishment Clause violation, but as discussed, *see supra* pp. 13–14, this interest is unfounded.  A misconceived fear of violating the Establishment Clause "hardly compare[s] to the deprivation of [the Knights'] and . . . other potential speakers' constitutional right to engage in free speech" and free exercise.  *Freethought Soc'y*, 938 F.3d at 442 (quotation marks omitted).  In fact, because Defendants are governmental actors, a preliminary injunction requiring their compliance with the Constitution "is not a harm, but rather is in [their] best interest." *Lofton v. D.C.*, 7 F. Supp. 3d 117, 125 (D.D.C. 2013).  Enjoining Defendants' no-religious-displays policy and their prohibition of the Knights' crèche display at the Bandstand/Boardwalk Circle

therefore "would cause neither the [City] nor its residents any serious injury." *Tenafly*, 309 F.3d at 178. But in the absence of an injunction, the Knights' free speech and free exercise rights will be abridged. *See id.* Thus, the balance of hardships plainly tips in favor of an injunction.

## IV. The Public Interest Favors A Preliminary Injunction

The public interest would undoubtedly be served by an injunction protecting the Knights' free speech and free exercise rights. It would "state the obvious" to note "that the public interest is not disserved by enforcing the First Amendment's core protection against viewpoint discrimination." *Freethought Soc'y*, 938 F.3d at 442. And in the free exercise context, the Third Circuit has recognized that "where there are no societal benefits justifying a burden on religious freedom, the public interest clearly favors the protection of constitutional rights." *Tenafly*, 309 F.3d at 178 (quotation marks omitted). If this Court intervenes and enjoins the City's no-religious-displays policy while litigation proceeds, the Knights and other speakers will be able to express a religious perspective on the Christmas holiday and participate in the community's holiday traditions at the Bandstand/Boardwalk Circle on equal terms with secular speakers. But if this Court does not intervene, the City will continue to discriminate against religious viewpoints and practice and will exclude the Knights and other religious speakers from communicating their message in the same forum and on the same topics as secular speakers. Until final judgment on the merits, it is in the public interest for this Court to intervene and implement a status quo that encourages more—not less—speech. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 361 (2010) ("[I]t is our law and our tradition that more speech, not less, is the governing rule.").

## CONCLUSION

For the foregoing reasons, the Knights respectfully requests that this Court grant its Motion for a Preliminary Injunction.

November 2, 2020

Respectfully submitted,
/s/ *Michael P. Morton*
Michael P. Morton (Bar ID # 002492)
Robert J. Valihura, Jr. (Bar ID # 02638)
David C. Zerbato (Bar ID # 005671)
MORTON, VALIHURA & ZERBATO, LLC
3704 Kennett Pike, Suite 200
Greenville Professional Building
Greenville, DE 19807
Telephone: (302) 426-1313
Fax: (302) 426-1300
mmorton@mvzllc.com

Christopher DiPompeo (*pro hac vice*)
Kaytlin L. Roholt (*pro hac vice*)
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001-2113
Telephone:  (202) 879-7686
Fax:  (202) 626-1700
cdipompeo@jonesday.com
kroholtlane@jonesday.com

Roger Byron (*pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 Plano Parkway, Suite 1600
Plano, TX 75075
Telephone: (972) 941-4444
Fax: (972) 941-4457
rbyron@libertyinstitute.org

*Counsel for Plaintiff Knights of Columbus*
*Star of the Sea Council 7297*